## Billiter & Shurtleff Coal Co. v. Luster.

Nov. 20, 1945.

O. T. Hinton for appellant.

J. Erwin Sanders for appellee.

18

Opinion of the Court by Morris, Commissioner—Affirming.

Appeal from a judgment for $500 awarded appellee for personal injury. Appellant operated a small coal mine, employing seven or eight men. Luster began work on May 3, 1943, and was injured by a fall of slate on May 7, while loading coal. Appellant was not operating under our Compensation Act. The suit being at common law, appellant could not rely upon the defenses set out in 342.410, KRS, and in answer it merely denied the allegations of the petition.

Luster asked $2500 on account of his injury, which he alleged had caused and will continue to cause him to suffer physical and mental pain; that his injuries are permanent, and his power to earn money or to secure employment had been impaired, all due to the carelessness and negligence of appellant in failing to furnish him a safe place in which to work. Upon a trial the jury awarded him $500. On appeal it is only contended (a) that there was not sufficient evidence of negligence on appellant's part to take the case to the jury. (b) There was not sufficient evidence of permanent injury, or of impairment of earning power to authorize an instruction on or recovery for permanent injury. The argument on point (b) is that it must be sufficiently shown that earning power has been permanently impaired. Chesapeake & O. R. Co. v. McCullough, 230 Ky. 478, 19 S. W. 2d 1047, cases cited, and Consolidated Coach Corp. v. Phillips, 236 Ky. 823, 34 S. W. 2d 722.

Luster, 39 years of age, with very little mining experience, went to his work loading coal about 10:00 a. m. May 7. He said he was loading a car, and had a stump that was almost down, and he took a pick, knocked the coal down, and began to throw coal toward the car, and while doing this "the rock fell and caught me." He said that Billiter, who had charge of loading, had come into his working place and set up two timbers, "all he had in the place," and "I told him the top was working, and was dangerous," and he replied: "It is no more danger in here than in the heading where you have been working. Go ahead and clean up this place, and shoot it down again." He said Billiter left and came back and "I told him it was still working there." He asked Billiter to set some more timbers; "he should have had some safety

timbers. When he came back in he laid the track up to the face of the coal, and we went ahead and just lacked a little of cleaning up when the rock fell and caught me.'' He does not say that Billiter said he would bring in or use more timbers, but did assure him that is was as safe there as in the place they had been working. Luster had been working in mines only about three months, and said he relied on Billiter's assurance that the place where he was working was safe. He described the piece of slate as being about 14 feet long, 8 feet wide and 6 inches thick, and said it caught him on the right shoulder; knocked him down and pinned him.

On cross-examination Luster said that he and Ben Billiter had set up the two timbers that morning; that the room was timbered back behind them, indicating that he and Billiter had timbered as they went along. He thought the last timber had been set about 8 or 9 feet from the coal facing, and that other timbers might have been set in this 8 foot space closer to the facing, without cleaning out the coal. He said he had earned about $22 for this three days' work, and his average wage was around $50 per week.

Appellee's 16 year old son was helping that morning; he testified substantially as his father had, and was sure that when Billiter had laid track toward the coal face, he was told that the top was working; that Billiter told him and his father to go on loading, and he would go out and send some timbers in. He said that little pieces of rock had been falling during the morning; several pieces fell on him. Billiter never sent any more timbers, and the injury occurred about thirty minutes after Billiter left. He describes the piece of slate and said: ''Some broke on the car and dropped on Daddy when it hit him.'' He removed some of the pieces, and he went through the break-through and got the pony driver and took Luster out of the mine, thence in an automobile to the doctor's office.

Ben Billiter, for defendant, testified that he had charge of operations; he had been in the room where Luster was working. He said he had hired Luster to run the bucket on the outside, and not as a coal loader, but that Henry Billiter, who had charge of shooting and loading coal, had taken him in to help in shooting and loading. He said that he had sent in a couple of tim-

bers which were set up to 8 feet of the facing. He said that if he had set more timbers toward the face "you couldn't work through them." He testified that from his experience it was not necessary to set any timbers closer to the face of the coal, and was positive that he had not noticed the top working; that Luster had not told him that it was doing so; that he had not told Luster the place was safe, or to go ahead and clean up and he would send him some other place, but told him to watch and if he saw the top working to "get out of the way and come and tell me." Other witnesses testified that the room where Luster was working was being driven near the outside or out-cropping, and that under the circumstances the supporting timbers should have been set from 1½ to 2 feet apart, and nearer the facing.

On the question of extent of injury and its effect, Luster testified that his right shoulder was dislocated; his right foot and right hand "mashed and strained, and had little cuts." He was taken to a doctor who X-Rayed and reduced the joint. He testified that he suffered much pain; could not rest at night, and testifying on March 30, 1944, said he still suffered at that time. Dr. Vernon testified that he treated Luster on May 7, 1943. He had a dislocated shoulder and injury to his hand and foot. The dislocation was reduced in good order; there was no fracture. Luster came back on the tenth complaining of pain in hand and foot. X-Rays were taken and showed no fracture. The doctor advised him to rest until he felt like returning to work. Asked if in his opinion Luster sustained permanent injury, he said he had not examined Luster since May 10, and could not state definitely that he had no permanent injury, but added, "I do not see why he should have any permanent injury."

On cross-examination he expressed the opinion that Luster should have been able to go back to work in a month or six weeks. He said it was possible that there might have been a stretching of or injury to the ligaments, which the X-Ray would not show. "If these were injured it would not permit free movement of the arm." The doctor did not bandage, but advised him to be careful not to raise his arm over his head, as it might cause another dislocation. Dr. Flanary examined Luster on March 17, 1944. He read the X-Ray pictures and found no fractures, and in his diagnosis agreed with Dr.

Vernon that the accident had caused no permanent injury. He had observed a few cases in which stretched ligaments failed to return to normal, and sometimes if there are careless movements of the arm dislocation might occur, "but I moved his arm in all directions and this didn't happen while I was examining him."

Luster testified that on his last visit to Dr. Vernon the doctor told him he was not using his shoulder enough; that he should use it some to prevent stiffness; he told him he could do light work; this he said might have been on May 10th. Following this suggestion, Luster on May 16th began driving a truck for Jones Elkhorn Coal Company at $5 per day. His former pay had been from seven to nine dollars per day. However, he said that in driving the truck, he, at all times, had the help of his son, who would change the gears and dump the coal, and "anything else to help out on the truck." Luster used his right hand by holding it on the bottom of the steering wheel, "but couldn't take it over the top of the wheel." He said he could make all left hand curves, but if it was a right hand curve the boy would "take hold." In brief he said he used his arm all he could without straining. He had tried to do some carpenter work, but could not raise his right arm to drive nails. He said he could use his arm for "reasonable light work, but not heavy work," and had much less strength and use of the right arm than he had before the injury. Before going to work in the mine he had worked for a lumber company handling heavy slate roofing and heavy lumber. He had returned for his old job, but found after trying that he could not handle the heavy materials. He had also tried to drive the Jones Company's truck by himself, but found he could not do so, and took his boy from school to help him.

On the question of there being sufficient evidence to take the case to the jury, and to sustain a verdict for plaintiff, little need be said. From the viewpoint of appellant, Luster's injuries were caused by his negligence, that is, in knocking down the coal stump, thus removing the support of the roof. According to Luster's testimony he was told by a superior workman to continue cleaning up to the face of the coal, and was assured that the place was as safe for work as the heading where he had been working. This is denied, but the conflict was a matter for the jury's determination. It must be noted that the

proof shows that Luster was an inexperienced miner, and while he knew the top was working, and says he called Billiter's attention to the fact, he was assured to some extent of the safety of the place, and told to go ahead and clean up. It is not shown that he had seen or had knowledge of the presence of the slate.

It is true that in several cases we have held that the safe place to work does not apply where the servant is injured in performing work to make an unsafe place safe, High Splint Coal Co. v. Baker, 247 Ky. 426, 57 S. W. 2d 60, or where the miner was told either to remove loose slate from the top or to place timbers, Perkins Harlan Coal Co. v. Mercer, 235 Ky. 618, 32 S. W. 2d 14. The duty of a mining company to furnish a servant a safe place for work depends upon the circumstances prevailing at the time of injury, and always on the facts shown by the proof. Helton v. Gunn Coal Mining Co., 258 Ky. 168, 79 S. W. 2d 695. In the latter case we held it to be the duty of the operator to prop the roof of a room where the servant was at work loading coal. In the first above cited case we held that if the superior workman or foreman knew, or by the exercise of ordinary care could have known, that the "squeezing" of the roof was dangerous, or created a dangerous condition, and still allowed the servant to continue work, the employer was liable for a sustained injury, since the Compensation Act deprives the employer of the right to rely upon the defense of contributory negligence or assumption of risk. It is also the accepted rule that if there is any evidence of negligence on the part of the master, and of its causal connection with the injury, a case is made for the jury. Here the probative force of Luster's testimony was for the jury. We think the case was properly submitted, and there was sufficient proof to justify the verdict.

The main argument of appellant is that there was no evidence of permanent injury or impairment of earnings, sufficient to warrant an instruction on, or to allow recovery for permanent injury. Appellant has cited several cases where we have held that when the testimony was vague or of not enough probative value to authorize recovery for permanent injury or impairment it was error for the court to so instruct, Harlan Fruit Co. v. Kilbourne, 280 Ky. 511, 133 S. W. 2d 730; Chesapeake & O. R. Co. v. McCullough, 230 Ky. 478, 19 S. W. 2d 1076.

In some of this class, where permanent injury was not shown, we concluded that the presumption arose that the jury may have included damages for permanent injuries in its verdict. See cases cited in Louisville & N. R. Co. v. Moore, 150 Ky. 692, 150 S. W. 849. It could hardly be said under the proof here that the jury showed any prejudice or was moved by the instruction to include damages for permanent injury or impairment.

Counsel for appellee rather mildly insists that under the proof the court was justified in giving an instruction on permanency or probability of permanency. We can hardly agree, but we have no difficulty in holding that the erroneous instruction was not prejudicial. An instruction which improperly permits an award for temporary damages, where the verdict is no more than reasonable to compensate for the injury sustained, is not prejudicial. In Coca Cola Bottling Co. v. Creech, 245 Ky. 414, 53 S. W. 2d 745, we said: "In order for an instruction to be prejudicially erroneous, the finding of the jury must give some reflection of that instruction." In Louisville & N. R. Co. v. Bowman, 208 Ky. 39, 270 S. W. 471, 472, we upheld a verdict for $1500 where instruction was given on permanence on very slight evidence, saying that the amount awarded was no more than reasonable compensation for the injuries, "without reference to the evidence of their permanency, so that this instruction could not be considered prejudicial."

We have held that the giving of an instruction on punitive damages is harmless where the award appeared to be compensatory only. St. Bernard Mining Co. v. Ashby, 164 Ky. 416, 175 S. W. 626, and upheld verdicts in cases where it was obvious that the award did not include any improper element of damages submitted. Chesapeake & O. R. v. Stump, 165 Ky. 708, 178 S. W. 1037; Morgan v. Williams, 179 Ky. 428, 200 S. W. 650. We are of the opinion that appellant was not prejudiced by the instruction complained of, and that there was sufficient evidence of negligence of the employer to take the case to the jury and to support the verdict.

Judgment affirmed.